**N. T. GREENE, Plaintiff-Appellant (78–1527),**

**Elnora Priest Cross, Edwin Owens and Carolyn Burse (78–1528), Plaintiffs-Intervenors-Appellants,**

v.

**CITY OF MEMPHIS, Wyeth Chandler, the Council of the City of Memphis and Edwin McBrayer, Defendants-Appellees.**

**Nos. 78–1527, 78–1528.**

United States Court of Appeals, Sixth Circuit.

Argued June 5, 1979.

Decided Nov. 1, 1979.

N. T. Greene, pro se.

Alvin O. Chambliss, Jr., National Conference of Black Lawyers, Oxford, Miss., for plaintiffs-appellants.

Michael C. Speros, Charles V. Holmes, Asst. City Attys., for defendants-appellees in both cases.

Clifford D. Pierce, Jr., City Atty., Memphis, Tenn., for defendants-appellees in No. 78–1527.

A. C. Wharton, Jr., Memphis Area Legal Services, Inc., Memphis, Tenn., for plaintiffs-intervenors-appellants.

Before CELEBREZZE, ENGEL and KEITH, Circuit Judges.

ENGEL, Circuit Judge.

This litigation arises out of efforts by the residents of Hein Park, a subdivision located in Memphis, Tennessee, to close West Drive at its northerly end so as to bar all through traffic.[1] As found by the district court, Hein Park

> was developed well before World War II as an exclusive residential neighborhood for white citizens and these characteristics have been maintained. To the west of Hein Park is the sizeable and handsomely landscaped Southwestern College campus; the southern boundary of Hein Park is a boulevard which is the northern boundary for a large park and zoo; the eastern boundary is a large crosstown thoroughfare, which also contains residences; and the northern boundary is Jackson Avenue which carries considerable traffic, much of which is commercial in nature.

The street involved in this litigation is known as West Drive. It extends the complete length of the subdivision, which is about one-half mile. Opposite West Drive on the north side of Jackson Avenue is a major thoroughfare, Springdale Street, which serves a sizeable area composed of black citizens. These are primarily the persons who will be inconvenienced by the so-called closing of West Drive.

As the map indicates, Springdale Street is, in fact, a northward extension, under another name, of West Drive.

The proposed closing is described by the district court in its opinion:

> The partial closing will be accomplished by having the northernmost property owners on West Drive buy a 25-foot east-west strip across the entire width of the street. Because officials of certain departments of the city deem it necessary that public service vehicles will be able to cross the strip, a 24-foot gap will be left in the barricade. There will be a speed breaker across the gap, but other details, such as signs, have not been finalized.

Although the record is uncertain whether the northernmost property owners who are acquiring the east-west strip across the width of West Drive will, in fact, bar all foot traffic as well, it is clear that the proposed conveyance will leave them with the absolute right to do so if they wish, since the property will be private in all respects except for retained rights-of-way for certain service and emergency vehicles and utility easements.

Plaintiffs, certain black individuals and members of a class of black persons in the City of Memphis who own or stand to inherit property immediately to the north of and adjoining the Hein Park area, have attempted from the beginning to prevent the closing. They principally claim in this lawsuit that the closing of West Drive deliber-

---

1. A map of central Memphis is attached hereto as an appendix.

ately creates a barrier between the all-white Hein Park subdivision and the predominantly black residential area to the north, limiting access to and from the latter and impairing their property values. The closing is claimed to be a violation of their rights under the Thirteenth and Fourteenth Amendments;[2] they seek relief under 42 U.S.C. §§ 1982 and 1983.[3]

In an earlier appeal, our court reversed a judgment of the district court which dismissed the original complaint for failure to state a claim. In so doing, we held that the district court relied too heavily on *Palmer v. Thompson*, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), and its ruling that the closings of municipal swimming pools would not violate the Equal Protection Clause of the Fourteenth Amendment where it was shown that such closings prevented whites and blacks equally from enjoying the pools. *Greene v. City of Memphis*, 535 F.2d 976 (6th Cir. 1976) (*Greene I*). In remanding, we held that the facts alleged in the complaint, construed in the light most favorable to the plaintiffs, stated claims under 42 U.S.C. § 1982 and, even though it had not then been specifically pleaded, under 42 U.S.C. § 1983. In dicta, our court further observed that:

> To establish a section 1982 or 1983 claim on remand, Greene must prove his allegations that city officials conferred the closed street on West Drive residents

because of their color; he must prove racial motivation, intent or purpose, in the absence of such egregious differential treatment as to in itself violate equal protection or, alternatively, to command an inference of racial motivation. [citations omitted]

This view does not conflict with *Palmer, supra*, which noted that "no ease in this Court has held that a legislative act may violate equal protection *solely* because of the motivations of the men who voted for it." 403 U.S. at 224, 91 S.Ct. at 1944, 29 L.Ed.2d at 444 (emphasis supplied). [citations omitted]

In *Palmer*, the closings left whites and blacks alike without municipal pools; consequently, there was "no state action affecting blacks differently from whites." 403 U.S. at 225, 91 S.Ct. at 1945, 29 L.Ed.2d at 445. According to the instant complaint allegations, the closing of West Drive left certain white residents with privacy and quiet of a dead-end street, though black residents, for racial reasons, have been and would be unable to acquire such a dead-end street.

535 F.2d at 979–80.

Upon remand, amendments to the complaint were filed, certain additional individuals moved and were permitted to intervene as plaintiffs and the court certified

2. U.S.Const. amend. XIII provides:
   Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.
   Section 2. Congress shall have power to enforce this article by appropriate legislation.
   U.S.Const. amend. XIV, in part, provides:
   Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.
   *    *    *    *    *    *

Section 5. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

3. 42 U.S.C. § 1982 (1976) provides:
   All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.
   42 U.S.C. § 1983 (1976) provides:
   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

this as a class action.[4] Thereafter a bench trial was conducted on the merits before the district judge who on June 21, 1978, entered a judgment in favor of the defendants on all remaining issues. In doing so, the judge obviously deemed himself confined to the rationale expressed in the dicta of our earlier opinion of reversal. Thus, his primary focus was on that proof which showed what action was taken by the City of Memphis on petitions filed from time to time by private citizens, white and black, to close streets and alleys within the city. In this respect the court observed that

> the action of the City Council which undertakes to close West Drive did not create a benefit for white citizens which has been denied black citizens. The proof shows that this is the only time that the street and alley closing procedure has been used to close a street which serves as a thoroughfare for the residents and the public. From the standpoint that the closing procedure has been used to close alleys and dedicated but unused streets, the proof shows that the procedure has benefited black citizens as well as white citizens.

The court, however, did hold that the proposed closing had a disproportionate impact upon the black citizens, but that the disparate impact was not so stark that a discriminatory motive could be inferred therefrom. The court stated that

> the closure of West Drive in the manner adopted by the City Council will have disproportionate impact on certain black citizens. However, the Court also concludes that there is not sufficient proof of racially discriminatory intent or purpose

on the part of the city officials to establish a constitutional violation.

\* \* \* \* \* \*

As heretofore indicated, by placing the narrow barrier at the intersection of West Drive and Jackson, the southbound overwhelmingly black traffic will no longer be allowed to continue a logical and direct route across Jackson. At the same time the white residents of West Drive will have considerably less traffic. The residents of West Drive also will have less inconvenience because most of their movement will logically take them southbound on departure and northbound on return.

However, this Court does not believe that the disparate impact is so stark that a purpose or intent of racial discrimination may be inferred. It must be noted that excessive traffic in any residential neighborhood has public welfare factors such as safety, noise, and litter, regardless of the race of the traffic and the neighborhood.

\* \* \* \* \* \*

Similarly this Court does not find a purpose or intent to racially discriminate based upon a consideration of other evidence in the case as directed in *Arlington Heights v. Metropolitan Housing Corp.,* supra, 429 U.S. [252] at 267, 68 [97 S.Ct. 555, 50 L.Ed.2d 450].

While ruling against the plaintiffs, the district judge nonetheless entertained serious reservations concerning the wisdom of the proposed closing. His opinion further stated:

> 3. That the issues embraced by this class action are to be confined to those in which injunctive or declaratory relief predominate.
> 4. That the monetary damage claims contained in the complaint, as amended, are made on behalf of the individual plaintiff-intervenors, and are not to be included as part of the relief sought on behalf of the members of the 23(b)(2) class, but said exclusion is not to preclude the seeking of such relief in other proceedings.

---

4. The class was certified in accordance with a stipulation filed by the parties. That stipulation, in part, provided:

> 1. That the civil action brought by the plaintiff-intervenors through their complaint for intervention, as amended, may be certified as a class action that meets the requirements of Federal Rules of Civil Procedure 23(a) and (b)(2).
> 2. That the class is composed of black persons in the City of Memphis who own or stand to inherit property surrounding and adjoining the area along West Drive and Hein Park Subdivision.

In the instant case, this federal court is of the opinion that it should refrain from applying its judgment on the merits even though the City Council opted for lessening the traffic problems for the white citizens of West Drive in spite of the adverse impact upon the black citizens north of Hein Park, the aggravation of racial hostility with the attendent (sic) retribution and vandalism caused by the obvious rejection, a reduction of response time for the fire and police and the inconvenience and delay to Sanitation Department employees.

The trial judge's observations were supported by the record. Besides the evidence previously described, included in the evidence before the court were the petitions circulated by the Shankman Hill Civic Club and signed by several hundred citizens residing immediately to the north of West Drive. Those petitions took note that "[t]his Closing Symbolizes in unmistakable terms a White neighborhood shutting its door on its adjacent Black and integrated Communities." In a colloquy with counsel for the city, the trial judge indicated his concern:

> THE COURT: (Interjecting) There is proof that this is just an invitation to vandalism and to defiance and confrontation from the people. Obviously the

black people north of there who are being told to stay out of the subdivision.

Further showing his extreme skepticism at the proposed closing, the trial court observed:

> THE COURT: I don't think it is going to stand or fall except it is another indication that somebody decided they were going to accomplish, partially accomplish what they hadn't been able to do in three years; the Hein Park Civic Club. They tried to keep all of the people north of Jackson from coming through there and that didn't work. So, now somebody; I don't know who it was, has come up with this clever idea that if we can get the two people on the corner to—I would be interested to know who is going to pay the eight hundred dollars [the agreed price of the 25-foot strip across West Drive]. If we get those two people to agree and lend us their names, we can stop these people to the north.[5]

The trial judge also particularly noted in his opinion the testimony of Dr. Marvin Feit, an Assistant Professor at the University of Tennessee Center of Health Sciences, who testified as an expert witness that "closing West Drive would result in negative consequences in the form of hostility toward the people who live in Hein Park, increased vandalism, school harassment, and increased arrests by police."[6]

---

5. The following exchange also occurred:

> THE COURT: I don't think that you can compare the closing of a part of an alley in an all black neighborhood to a situation where an all white neighborhood is seeking to stop the traffic from an overwhelmingly black neighborhood from coming through their street.
> MR. SPEROS: Well, Your Honor, there has been no proof that it is an overwhelmingly black neighborhood to the north.
> THE COURT: Have you been out there?
> MR. SPEROS: I used to live out there.
> THE COURT: Used to, you don't now?
> MR. SPEROS: Well, Sir, I lived on Overton Park which is just south of there just—
> THE COURT: (Interjecting) I'm talking about Springdale. Coming across there. You don't think that is predominently (sic) black?
> MR. SPEROS: I am saying that there was no proof introduced to that effect, Your Honor. If you want to take judicial notice of it.

> THE COURT: I will take judicial notice of the fact that that is one of the areas that—we use the word "predominently" (sic). I am sure that it is not all black. Predominently (sic) is kind of a delicate word. Hein Park is not predominently (sic) white, it is white.
> So, if the City Council didn't know that that property coming up to Jackson Avenue was predominently (sic) black, then I have got my doubts about them.

No contrary claim has been made on appeal, nor did any party object to the judicial notice so taken.

6. Dr. Feit further testified:

> There are several things that I think could very easily happen. First, one of the most important things that I think will occur is an increase in hostility directed towards the people in Hein Park. Acts of vandalism will most likely increase in the community where if people, children and teenagers know and perceive that the people in Hein Park are

The trial judge additionally relied in his findings upon the testimony of plaintiff's witness, Harold Moore, a licensed real estate broker, to the effect that the proposed closing would be a real benefit to the residents on West Drive. It is significant, however, that while Moore opined in his original testimony that because of the closing "there would not be a lessening of value in those properties in the Springdale area," his testimony shortly thereafter modified that view considerably:

> In my opinion, with the 17 years experience in the real estate industry, psychologically it [the street closing], would have a deterring, depressing effect on those individuals who might live north of the Hein Park area. With the closure of the street, the creation of another little haven, the fact that these people are in a lower economic social group and wouldn't be able to actually afford housing with the illustrious price tags of those houses in the Hein Park area, it would be, in my opinion, like the individual looking in the pastry store who doesn't have a dime and who can't afford it. And consequently,

as a result of such, their moralistic values on their properties could tend to be such that the upkeep would not be nearly so great and it could have a detrimental effect on the property values in the future.

The foregoing citations from the record can only be reconciled with the court's ultimate decision by concluding that the judge believed himself limited in his inquiry on remand to determining whether the proofs showed that in closing West Drive to reduce noise and traffic, the City of Memphis had conferred upon the white residents of West Drive a benefit that it had refused to black citizens when they had applied for similar relief. If this was, in fact, the limit of the inquiry, the decision must be upheld, for indeed the record did not show that any black resident had ever sought to close a street primarily for purposes of reducing the traffic and contributing to the tranquility of a given neighborhood. We have considerable sympathy with the trial judge's view of his responsibility on remand since it seems supported at least by the cited dicta

> receiving something of a personal benefit that other people are not physically able to get.
>
> A second consequence is going to be in school and which I think there very easily will be increased harrassment [sic] on the part of the children in the community that attend Snowden School and maybe a couple of other places, to the extent that the school, and the street, which now has a reasonable degree of integration and a reasonable degree of harmony flowing between the two areas, will effectively be destroyed.
>
> Q Which street are you talking about now?
>
> A The harmony that exists between Hein Park and West Drive and the Vollentine area. That harmony will be effectively destroyed.
>
> That barrier will not in any way decrease foot traffic. In fact, it may serve as a magnet to bring more people to that place. I think if you ever wanted to create a monument to increased hostility, you would do that and that would serve as a magnet to bring people to a street to demonstrate very clearly that that is evidence of people being able to get favoritism. And as a result, and I have seen this happen in many other cities, you do get an increase and a long-term increase of vandalism on the street and in the area, particularly in Hein Park.

> Q So that you are not restricted—well, let me ask the question this way. I think your testimony indicates that the hostility would be directed towards the residents of West Drive; is that correct?
>
> A Very easily.
>
> Q What, if anything, Dr. Feit, would this exertion of hostility have on the Black persons north of that area?
>
> A Well, normally what happens is that people get on the telephone and call the Police Department. This is going to result in increased cost to the people of the city of Memphis because more policemen are going to have to come over there and investigate and as a result they will spend more time in the Black community. Obviously it is going to probably bring about an increase in arrests and harrassment [sic] of more Black youths, not in any way helping the City of Memphis Police Department do its job dealing with crime. They will have to spend increasingly more time in the Black community to locate vandals as opposed to dealing with crime.
>
> \* \* \* \* \* \*
>
> . . . I think that the barrier is going to serve as a monument to racial hostility because now more people have access between the Vollentine area and Hein Park.

of our opinion. We do not conceive, however, that this was ever the full intent of our earlier decision, and it seems equally clear that the plaintiffs themselves never abandoned their effort to seek relief on a broader basis. Plaintiffs' posture in their pleadings and throughout the trial was consistent with the closing argument of their counsel:

> Going back to *1982*, which refers to the rights of blacks to hold their property in the same manner as whites, we feel that the closing of West Drive and the enhancement of the value of the properties along West Drive and the attendant and simultaneous decrease in property values that we think we have established here by the testimony of our witnesses in the black neighborhood does deny them a right protected by Section 1982. If the right is to uphold your property, we think that that right has been deprived. Not necessarily from the comparative standpoint of have black citizens ever applied for a street to be closed of this size and didn't get it, and then just close off the inquiry there.
>
> Now we understand the parameters of the Sixth Circuit's decision in this, but we would suggest that the interpretations of *1982* refer to the full panacean [sic: panoply] of property rights, not necessarily the transfer of property.
>
> Now, we also ask this Court in reviewing this matter be mindful of the Supreme Court's starting point and its instruction of how a case of this nature should be considered. We think that the key language; and I think this is of supreme importance here, the key language is that the Court has to conduct a sensitive inquiry. It would be our argument and it is our argument that a sensitive inquiry in a matter of this type where we are contending that there was racial motivation, racial impact entails taking in everything that was brought forth here.

The "sensitive inquiry" referred to by counsel for the plaintiffs was taken from language of the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). There the Supreme Court was faced with the question of whether the refusal of the Village of Arlington Heights to authorize the construction of a public housing project within its boundaries in suburban Chicago was racially discriminatory and violated the Fourteenth Amendment. As Mr. Justice Powell observed:

> Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action—whether it "bears more heavily on one race than another," *Washington v. Davis, supra*, 426 U.S. [229] at 242 [96 S.Ct. 2040, 48 L.Ed.2d 597]—may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. *Yick Wo v. Hopkins*, 118 U.S. 356 [65 S.Ct. 1064, 30 L.Ed. 220] (1886); *Guinn v. United States*, 238 U.S. 347 [35 S.Ct. 926, 59 L.Ed. 1340] (1915); *Lane v. Wilson*, 307 U.S. 268 [59 S.Ct. 872, 83 L.Ed. 1281] (1939); *Gomillion v. Lightfoot*, 364 U.S. 339 [81 S.Ct. 125, 5 L.Ed.2d 110] (1960). The evidentiary inquiry is then relatively easy. But such cases are rare. Absent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative, and the Court must look to other evidence.

Id. at 266, 97 S.Ct. at 564 (footnotes omitted).[7]

■ While in his opinion, the trial judge expressly indicated his awareness of *Arling-*

---

**7.** Mr. Justice Powell was referring here to *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), and its holding that the petitioners were illegally imprisoned for failure to comply with a city ordinance where such failure was the result of the city's refusal to consent to the petition of approximately 200 persons of Chinese ancestry to operate a laundry business while the same consent was granted 80 others who were not of Chinese descent. The Court held that this worked an impermissible denial of the equal protection of the laws and hence a violation of the Fourteenth Amendment, even where no express evidence

*ton Heights, supra,* we believe that he conceived himself limited in his capability to grant relief by the language in *Greene I* and that he placed too high a threshold upon the requirements of Section 1982 and, underlying it, the Thirteenth Amendment. In short, we conclude that, upon his own findings and upon the proof credited by him, the pattern of discrimination here was indeed "stark" and was in a very real sense a badge of slavery violative of plaintiffs' rights under the Thirteenth Amendment and subject to relief under 42 U.S.C. § 1982.[8]

We readily acknowledge that, as a general proposition, street closings are a matter of purely local concern. We also recognize that street closings may, indeed, be a very beneficial way of preserving the residential character of a neighborhood against the growing incursion of traffic from outside sources. Thus we take note of plaintiff's reliance upon *Arlington County Board v. Richards,* 434 U.S. 5, 98 S.Ct. 24, 54 L.Ed.2d 4 (1977), and the Court's observation that:

A community may also decide that restrictions on the flow of outside traffic into particular residential areas would enhance the quality of life there by reducing noise, traffic hazards, and litter.

*Id.* at 7, 98 S.Ct. at 26.

We further recognize that not every racially discriminatory act constitutes a badge of slavery. *See e. g., Civil Rights Cases,* 109 U.S. 3, 24–25, 3 S.Ct. 18, 27 L.Ed. 835 (1883). *Cf. Runyon v. McCrary,* 427 U.S. 160, 211, 96 S.Ct. 2586, 2614, 49 L.Ed.2d 415 (1976) (White, J., dissenting) ("A racially motivated refusal to hire a Negro or a white babysitter or to admit a Negro or a white to a private association cannot be called a badge of slavery . . . ."). Nonetheless, the Supreme Court "recognized long ago that, whatever else they may have encompassed, the badges and incidents of slavery—its 'burdens and disabilities'—included restraints upon 'those fundamental rights which are the essence of civil freedom . . ..' " *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 441, 88 S.Ct. 2186, 2204, 20 L.Ed.2d 1189 (quoting *Civil Rights Cases, supra,* 109 U.S. at 22, 3 S.Ct. 18).[9]

---

of intent was found. In this regard the Court found the facts themselves sufficient:

> The fact of this discrimination is admitted. No reason for it is shown, and the conclusion cannot be resisted that no reason for it exists except hostility to the race and nationality to which the petitioners belong, and which, in the eye of the law, is not justified. The discrimination is therefore illegal, and the public administration which enforces it is a denial of the equal protection of the laws, and a violation of the Fourteenth Amendment of the Constitution. *Id.* at 374, 6 S.Ct. at 1073.

In *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), also cited by Mr. Justice Powell, the Supreme Court struck down a local act of the Alabama legislature which redefined the boundaries of the City of Tuskegee with the effect of removing from the city all save only four or five of its 400 Negro voters while not removing a single white voter or resident. As Mr. Justice Frankfurter observed:

> The result of the Act is to deprive the Negro petitioners discriminatorily of the benefits of residence in Tuskegee, including, *inter alia,* the right to vote in municipal elections. *Id.* at 341, 81 S.Ct. at 127.

**8.** Because of our holding that the plaintiffs are entitled to relief under Section 1982, we do not reach the question whether relief could be predicated directly on the Thirteenth Amendment with the cause of action lying under Section 1983. Neither our circuit nor the Supreme Court has decided this question. We note, however, that constitutional rights other than those contained in the Fourteenth Amendment have been protected under Section 1983. *See, e. g., Lane v. Wilson,* 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939) (violation of Fifteenth Amendment remedied under R.S. § 1979, the predecessor of Section 1983).

**9.** Senator Trumbull, the sponsor of the bill which ultimately became the Civil Rights Act of 1866, stated that

> this measure is intended to give effect to that declaration and secure to all persons within the United States practical freedom. There is very little importance in the general declaration of abstract truths and principles unless they can be carried into effect . . . . Of what avail will it now be that the Constitution of the United States has declared that slavery shall not exist, if in the late slaveholding States laws are to be enacted and enforced depriving persons of African descent of privileges which are essential to freemen?
>
> It is the intention of this bill to secure those rights.

We are convinced that the erection of the physical barrier between a historically all-white residential neighborhood and a predominantly black neighborhood under the particular circumstances found by the court here is precisely the type of "badge" which was the target of the Thirteenth Amendment and of Section 1982.[10] The broad reach of Section 1982 was repeatedly emphasized by Mr. Justice Stewart in *Jones, supra*, 392 U.S. at 422–37, 88 S.Ct. 2186. As the Supreme Court later observed in *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969), "[a] narrow construction of the language of § 1982 would be inconsistent with the broad and sweeping nature of the protection meant to be afforded by [the Act]."

42 U.S.C. § 1982 was enacted under authority of Section 2 of the Thirteenth Amendment.[11] *Jones, supra*, 392 U.S. at 413, 88 S.Ct. 2186. Congress therein determined that the disability of blacks to enjoy property in the same manner as whites was a badge and incident of slavery. *Id.* at 439, 88 S.Ct. 2186.[12]

While the Supreme Court has not often been required to define "badge of slavery" under the Thirteenth Amendment, it is clear that many badges of slavery either were a part of the recent past or remain a part of the present. As Mr. Justice Douglas stated:

Some badges of slavery remain today. While the institution has been outlawed, it has remained in the minds and hearts of many white men. Cases which have come to this Court depict a spectacle of slavery unwilling to die. We have seen contrivances by States designed to thwart Negro voting, e. g., *Lane v. Wilson*, 307 U.S. 268 [59 S.Ct. 872, 83 L.Ed. 1281]. Negroes have been excluded over and again from juries solely on account of their race, e. g., *Strauder v. West Virginia*, 100 U.S. 303 [, 25 L.Ed. 664], or have been forced to sit in segregated seats in courtrooms, *Johnson v. Virginia*, 373 U.S. 61 [83 S.Ct. 1053, 10 L.Ed.2d 195]. They have been made to attend segregated and inferior schools, e. g., *Brown v. Board of Education*, 347 U.S. 483 [74 S.Ct. 686, 98 L.Ed. 873], or been denied entrance to colleges or graduate schools because of their color, e. g., *Pennsylvania v. Board of Trusts*, 353 U.S. 230 [77 S.Ct. 806, 1 L.Ed.2d 792]; *Sweatt v. Painter*, 339 U.S. 629 [70 S.Ct. 848, 94 L.Ed. 1114]. Negroes have been prosecuted for marrying whites, e. g., *Loving v. Virginia*, 388 U.S. 1 [87 S.Ct. 1817, 18 L.Ed.2d 1010]. They

36 Cong. Globe 474 (1866).

**10.** We also note that Section 1982 is limited in its scope to situations having a racial character. "The legislative history of the 1866 Act clearly indicates that Congress intended to protect a limited category of rights, specifically defined in terms of racial equality." *George v. Rachel*, 384 U.S. 780, 791, 86 S.Ct. 1783, 1789, 16 L.Ed.2d 925 (1966).

**11.** 42 U.S.C § 1982, in its original form, was enacted as part of the Civil Rights Act of 1866. Act of April 9, 1866, ch. 31, § 1, 14 Stat. 27, re-enacted by the Enforcement Act of 1870, ch. 114, § 18, 16 Stat. 144, and codified in § 1978 of the Revised Statutes of 1874, now 42 U.S.C. § 1982.

**12.** Mr. Justice Bradley in the *Civil Rights Cases, supra*, 109 U.S. at 20, 3 S.Ct. at 28, stated regarding the Thirteenth Amendment:

By its own unaided force and effect it abolished slavery, and established universal freedom. Still, legislation may be necessary and proper to meet all the various cases and

circumstances to be affected by it, and to prescribe proper modes of redress for its violation in letter or spirit. And such legislation may be primary and direct in its character; for the amendment is not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States.

It is true that slavery cannot exist without law any more than property in lands and goods can exist without law, and therefore the Thirteenth Amendment may be regarded as nullifying all State laws which establish or uphold slavery. But it has a reflex character also, establishing and decreeing universal civil and political freedom throughout the United States; and it is assumed that the power vested in Congress to enforce the article by appropriate legislation, clothes Congress with power to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States;

have been forced to live in segregated residential districts, *Buchanan v. Warley*, 245 U.S. 60 [38 S.Ct. 16, 62 L.Ed. 149], and residents of white neighborhoods have denied them entrance, *e. g., Shelley v. Kraemer*, 334 U.S. 1 [, 68 S.Ct. 836, 92 L.Ed. 1161]. Negroes have been forced to use segregated facilities in going about their daily lives, having been excluded from railway coaches, *Plessy v. Ferguson*, 163 U.S. 537 [16 S.Ct. 1138, 41 L.Ed. 256]; public parks, *New Orleans Park Improvement Assn. v. Detiege*, 358 U.S. 54 [79 S.Ct. 99, 3 L.Ed.2d 46]; restaurants, *Lombard v. Louisiana*, 373 U.S. 267 [, 83 S.Ct. 1122, 10 L.Ed.2d 338]; public beaches, *Mayor of Baltimore v. Dawson*, 350 U.S. 877 [76 S.Ct. 133, 100 L.Ed. 774]; municipal golf courses, *Holmes v. City of Atlanta*, 350 U.S. 879 [76 S.Ct. 141, 100 L.Ed. 776]; amusement parks, *Griffin v. Maryland*, 378 U.S. 130 [84 S.Ct. 1770, 12 L.Ed.2d 754]; buses, *Gayle v. Browder*, 352 U.S. 903 [77 S.Ct. 145, 1 L.Ed.2d 114]; public libraries, *Brown v. Louisiana*, 383 U.S. 131 [86 S.Ct. 719, 15 L.Ed.2d 637]. A state court judge in Alabama convicted a Negro woman of contempt of court because she refused to answer him when he addressed her as "Mary," although she had made the simple request to be called "Miss Hamilton." *Hamilton v. Alabama*, 376 U.S. 650 [84 S.Ct. 982, 11 L.Ed.2d 979].

*Jones, supra*, 392 U.S. at 445–46, 88 S.Ct. at 2206 (concurring opinion).

The closing of West Drive is merely another device leading to the same result. It would be, to blacks and whites alike, exactly what the trial judge said it was: an unmistakable warning to the black people living to the north of West Drive to stay out of the Hein Park subdivision. "[W]hen

racial discrimination herds men into ghettos and makes their ability to buy property turn on the color of their skin, then it too is a relic of slavery." *Jones, supra*, 392 U.S. at 442–43, 88 S.Ct. at 2205.

Without endeavoring to establish any legal guidelines for the determination of when conduct may amount to a badge of slavery, we find the determinations made by the district court here to be altogether adequate to bring the conduct complained of within that description. The community to be benefited by the closing was and had historically been all white. Conversely, the territory to be burdened by the closing was predominantly black. The barrier was to be erected precisely at the point of separation of these neighborhoods and would undoubtedly have the effect of limiting contact between them. The proposed closing was not enacted in response to any uniform city planning effort, directed generally to the preservation of the residential neighborhoods throughout the city; instead it appears to have been a unique step to protect one neighborhood from outside influences which the residents considered to be "undesirable." Finally, there was some evidence, credited by the district court, of an economic depreciation in the property values in the predominantly black residential area with a corresponding increase in the property values in Hein Park. The result, under the unique circumstances here, can only be seen as one more of the many humiliations which society has historically visited upon blacks. Where that racial humiliation not only rises to the level of a badge of slavery but also affects the right of blacks to hold property in the same manner as other citizens, then Section 1982 has been violated and the federal courts must provide a suitable remedy.[13]

---

**13.** We expressly leave open here the question to what extent intent is ever an element of the plaintiff's case under Section 1982. *Compare* Note, *Racially Disproportionate Impact of Facially Neutral Practices—What Approach under 42 U.S.C. Sections 1981 and 1982?*, 1977 Duke L.J. 1267 *with* Comments, *Burden of Proof in Racial Discrimination Actions Brought*

*Under the Civil Rights Acts of 1866 and 1870: Disproportionate Impact or Discriminatory Purpose?*, 1978 B.Y.U.L.Rev. 1030. Cf. *County of Los Angeles v. Davis*, 440 U.S. 625, 99 S.Ct. 1379, 1386, 59 L.Ed.2d 642 (1979) (Powell, J., dissenting) (whether case brought under 42 U.S.C. § 1981 requires proof of racially discriminatory intent or purpose is an open question).

## OTHER ISSUES

In addition to their Sections 1982 and 1983 claims, the plaintiffs raised certain pendent state claims. The district court held that "the evidence does not support a recovery under these or any other theory under the law of Tennessee." The appellants have not questioned that decision in this appeal; we therefore have not considered it. The plaintiffs also sought a decree that the defendants should be required to cause sidewalks, curbs and gutters to be installed on West Drive. The district court found no basis for such relief and we agree. We likewise agree with the district court's decision that the plaintiffs failed to prove their claim of a violation of their rights to procedural due process under the Fifth and Fourteenth Amendments.

## CONCLUSION

In conclusion we hold that under the unique circumstances shown here, the erection of the barrier at the northerly boundary of West Drive constitutes a badge of slavery adversely affecting the ability of the plaintiffs to hold and enjoy their property, in violation of their rights under the Thirteenth Amendment and entitling them to a remedy under Section 1982.[14] Accordingly, the judgment of the district court is reversed and the cause remanded for the fashioning of appropriate injunctive relief.

Appendix A to follow.

---

14. "The fact that 42 U.S.C. § 1982 is couched in declaratory terms and provides no explicit method of enforcement does not, of course, prevent a federal court from fashioning an effective equitable remedy." *Jones, supra,* 392 U.S. at 414 n. 13, 88 S.Ct. at 2190 n. 13.

**406**

CELEBREZZE, Circuit Judge, dissenting.

I must respectfully dissent because I am convinced that the majority has erred in several important respects. First, I do not believe that 42 U.S.C. § 1982 is violated by a municipality's exercise of its police powers to close a street when race is not a factor in that decision. The closing of West Drive here does not deprive black citizens of their right to hold property free from racial discrimination in the same manner as white citizens. The majority's extension of § 1982 so as to proscribe the closing of West Drive expands the scope of the statute to an unprecedented extreme and conflicts with the well-established policy of judicial deference to legislative judgment in land use regulation. Indeed, today's decision illustrates the need for a limiting principle for claims arising under § 1982. To this end I would require a showing of discriminatory intent or purpose to establish a violation of § 1982.

Second, the proper focus of this litigation, as recognized by the district court, is whether a racial minority would be denied the equal protection of the laws by the proposed street closing. I believe the district court was correct in finding that the plaintiffs had failed to demonstrate the discriminatory intent necessary to establish a

violation of the equal protection clause of the fourteenth amendment. I would accordingly affirm the judgment of the district court.

## I

In *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186 (1968), the Supreme Court held that the enabling clause of the thirteenth amendment vests Congress with the power to identify "badges of slavery" and pass remedial legislation "necessary and proper" to eliminate them. *Id.* at 439–40, 88 S.Ct. 2186. In enacting 42 U.S.C. § 1982 Congress found discrimination against blacks in the sale and rental of property to constitute such a "badge of slavery" prohibited by the thirteenth amendment. *Id.* at 440–41, 88 S.Ct. 2186 § 1982 accordingly outlaws all racial discrimination, public and private, in the sale, rental, or holding of real property.

The majority's focus in this litigation is whether the right of black citizens residing north of Hein Park to "hold" their property in the same manner as white citizens residing in Hein Park would be violated by the erection of a traffic barrier on a street connecting the two neighborhoods. The majority concludes that the construction of the barrier will adversely affect black property owners north of Hein Park while at the same time benefiting white residents in Hein Park. In this disparate impact the majority discerns a violation § 1982 and the thirteenth amendment.

It is true that the scope of § 1982 is exceptionally broad, reaching all public and private discrimination in activity affecting real and personal property. *Jones,* 392 U.S. at 437–39, 88 S.Ct. 2186. The statute's proscription of racial discrimination against a

citizen "holding" real property does not, however, preclude the legitimate exercise of a municipality's police powers. Where, as here, a municipality exercises those powers in a rational manner to achieve permissible goals,[1] absent evidence of racial motivation or intent, the right to "hold" property in the manner secured by § 1982 is not violated.

The right to "hold" property is the right to maintain possession while enjoying the privileges and benefits which ownership or occupancy entails in a manner untainted by racial discrimination. That right does not include an inviolate license of universal street access. Rather, street access, falling as it does within the category of land use, is a subject exclusively within the legislative province and subject to regulation in the public interest.[2] There is no requirement that legislative decisions regarding land use affect all persons equally. By definition, a street closing will not result in an identical impact upon residents and non-residents.

The closing of West Drive would have a disproportionate impact both racial and geographical in nature. As a result of racial residential segregation in the area, the black neighborhood north of Hein Park will no longer have access to West Drive, while the white Hein Park neighborhood will enjoy the increased solitude and safety accruing from a decrease in traffic. While distinctions based on race are inherently suspect, distinctions between residents and non-residents of a local neighborhood are not invidious. *Arlington County Board v. Richards,* 434 U.S. 5, 7, 98 S.Ct. 24, 54 L.Ed.2d 4 (1977).

In light of the deference accorded legislative judgments in matters of land use regulation,[3] and because the district court's find-

---

1. The stated objectives of the application to close West Drive were: 1) to reduce the flow of traffic; 2) to enhance safety for children who walk to school; and 3) to reduce traffic pollution in the residential area such as noise and litter. The legitimacy of these goals is well established. *See Arlington County Board v. Richards,* 434 U.S. 5, 7, 98 S.Ct. 24, 54 L.Ed.2d 4 (1977).

2. Although matters of land use are within a municipality's police powers, the wide latitude

in classifying and limiting property uses is always "[s]ubject to specified constitutional limitations." *Berman v. Parker,* 348 U.S. 26, 32, 75 S.Ct. 98, 99 L.Ed. 27 (1954).

3. *See Arlington County Board v. Richards,* 434 U.S. 5, 98 S.Ct. 24, 54 L.Ed.2d 4 (1977); *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926).

ing of an absence of racial motivation is supported by the record, the proposal to close West Drive must be viewed as creating a distinction based upon residency, not upon race. Since distinctions between residents and non-residents are permissible, without proof of racial motivation or intent I cannot conclude that the racially disproportionate impact here is sufficient circumstantial proof of the racial discrimination outlawed by § 1982.

Indeed, today's decision represents an unfortunate overreading of section 1982. The majority's willingness to characterize the proposed street closing as a violation of § 1982 demonstrates the need for a limiting principle for actions brought under this section. The section 1982 screening mechanism, as in actions proceeding directly under the fourteenth amendment, should be a requirement of a showing of discriminatory intent.

Although the district court did not analyze the case under § 1982 and the thirteenth amendment, the majority faults the district judge for placing "too high a threshold upon the requirements of Section 1982 and, underlying it, the Thirteenth Amendment." The district court, however, did no more than follow the directions issued by this court in remanding the case:

> To establish a section 1982 or 1983 claim on remand, Greene must prove his allegations that city officials conferred the closed street on West Drive residents because of their color; *he must prove racial motivation, intent or purpose,* in the absence of such egregious differential treatment as to in itself violate equal protection or, alternatively, to command an inference of racial motivation.

*Greene v. City of Memphis,* 535 F.2d 976, 979 (6th Cir. 1976) (emphasis added).

The majority dismisses this instruction as dictum and does not address the question of whether cases brought under § 1982—like cases brought directly under the fourteenth amendment—always require proof of discriminatory intent. I believe that we are required to follow the explicit instructions

of our prior decision regarding the components of a § 1982 claim, and would therefore require a showing of discriminatory intent to establish a violation of section 1982.

Interpreting section 1982 to require discriminatory intent is consistent with the Supreme Court's admonition in *Jones* that Congress intended section 1 of the Civil Rights Act of 1866—the source of § 1982— "to prohibit *all racially motivated* deprivations of the rights enumerated in the statute . . . ." 392 U.S. at 426, 88 S.Ct. at 2196 (emphasis added). Section 2 of the 1866 Act reinforces the requirement of racial intent by imposing sanctions upon anyone who, under color of law, deprives another of the rights protected by section 1 "by reason of his color or race." 14 Stat. 27.

The legislative history of § 1982 also indicates that it should parallel the fourteenth amendment's standard of proof. Although the 1866 Act, the forerunner of § 1982, is generally regarded as a "Thirteenth Amendment statute," *see Jones,* 392 U.S. at 422, 437–38, 88 S.Ct. 2186, it has also been found to rely on the fourteenth amendment. The fourteenth amendment was enacted, in part, to eliminate doubts about the constitutionality of the 1866 Act. *Id.* at 436, 88 S.Ct. 2186. It is not unreasonable to conclude that the standards for establishing a prima facie case of discrimination under § 1982 and the equal protection clause of the fourteenth amendment should be the case: there must be proof of discriminatory intent.

Finally, an observation made by the Supreme Court in *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), is relevant here. The court was concerned about the problems that could be generated if the fourteenth amendment was violated by a mere showing of disparate racial impact:

> A rule that a statute designed to serve neutral ends is nevertheless invalid, absent compelling justification, if in practice it benefits or burdens one race more

than another would be far-reaching and would raise serious questions about, and perhaps invalidate, a whole range of tax, welfare, public service, regulatory, and licensing statutes that may be more burdensome to the poor and to the average black than to the more affluent white.

Given that rule, such consequences would perhaps be likely to follow. However, in our view, extension of the rule beyond those areas where it is already applicable by reason of statute, such as in the field of public employment, should await legislative prescription.

426 U.S. at 248, 96 S.Ct. at 2051–2052 (footnote omitted).

Section 1982, extending as it does to the expansive realm of both public and private action involving property, might well precipitate many of these same consequences if proof of discriminatory intent is not required. For these reasons, I cannot agree that the facts and circumstances of this case establish a violation of 42 U.S.C. § 1982.

## II

The district court based its decision in favor of the City of Memphis on the plaintiffs' failure to establish the requirements of a prima facie case under the equal protection clause of the fourteenth amendment. The district court found that the closing of West Drive would have a "disproportionate impact on certain black citizens," but there was not "sufficient proof or racially discriminatory intent or purpose on the part of the city officials to establish a constitutional violation." Moreover, the district court did not believe that the disparate impact was so stark that an intent of racial discrimination could be inferred. I conclude that the district court's findings of fact and conclusions of law are neither clearly erroneous, F.R.Civ.P. 52(a), nor incorrect as a matter of law.

Recent Supreme Court decisions mandate that to establish that a governmental defendant has deprived plaintiffs of constitutional rights guaranteed by the fourteenth amendment, something more than a disproportionate discriminatory impact must be shown. Proof of a racially discriminatory intent or purpose is also required to show a violation of the equal protection clause. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 239–45, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The recent opinion of *Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), provides a functional definition of "intent":

"Discriminatory purpose," however, implies more than intent as volition or intent as awareness of consequences. *See United Jewish Organizations v. Carey,* 430 U.S. 144, 179 [, 97 S.Ct. 996, 51 L.Ed.2d 229] (concurring opinion). It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

*Id.* 442 at 279, 99 S.Ct. at 2296 (footnote omitted).

Applying the Supreme Court's elaboration in *Feeney* of the *Washington v. Davis* and *Arlington Heights* impact-plus test, the district court's conclusions are, if anything, reinforced. The record contains not even a scintilla of evidence indicating that the Memphis City Council approved the proposal to close West Drive "because of" the adverse effects the black citizens north of Hein Park might experience.

The absence of evidence of discriminatory intent does not, however, signal the end of the inquiry. Under the applicable *Arlington Heights* criteria, "invidious discriminatory purpose" can be inferred or detected through an inquiry which weighs a number of factors. Proof of discriminatory intent does not pose an insurmountable obstacle because *Arlington Heights* liberalized the probative value of various kinds of circumstantial evidence relevant in an inquiry into motive.

The first *Arlington Heights* factor—disparate impact—is present here. As I indi-

cated, the disparate impact of the closing of West Drive is both racial and geographical in nature. I believe that the district court was correct in concluding that this disparity does not constitute a stark pattern of discrimination from which racial intent can be inferred. It is clear that disparate impact, standing alone, will only infrequently suffice to establish an equal protection violation. *Washington v. Davis,* 426 U.S. at 242, 96 S.Ct. 2040; *Arlington Heights,* 429 U.S. at 265–66, 97 S.Ct. 555. Absent a stark pattern of discrimination from which intent may be inferred, further inquiry is necessary.

The second evidentiary source bearing on intent is the historical background of the decision. Particularly relevant here would be a "series of official actions taken for invidious purposes." *Arlington Heights,* 429 U.S. at 267, 97 S.Ct. at 564. Upon careful examination, the background of the decision to close West Drive appears untainted by any invidious action. The legislative machinery was set in motion by the submission of an appropriate application to the Planning Commission. The Commission processed the application and in time, the City Council voted to approve the closing. In sum, the "background" of this decision fails to reveal racial intent. And the same result is reached in considering the third factor specified in *Arlington Heights*—the specific sequence of events leading to the challenged decision.

The district Court's opinion does not record any instances of departures from normal procedural sequences or any "substantive" departures from normal decisionmaking (the fourth and fifth *Arlington Heights* factors). To the contrary, the decision to approve the closing of West Drive is consistent with the approvals granted other applications to close streets and alleys. It is true that the West Drive application is the first attempt to close a street in the nature of West Drive. Yet I cannot subscribe to the view that the initial attempt to utilize procedures prescribed by law for closing a street, without more, constitutes circumstantial proof of racial bias.

Where, as here, the applicable *Arlington Heights* "evidentiary sources" for a gleaning of official intent fail to reveal direct and circumstantial proof of discriminatory intent, an inference of invidious purpose cannot be drawn. I do not find from the record before me that in closing the street the City infringed upon constitutional rights, nor do I find that the City acted with malice or intent to discriminate because of race. Therefore, I would affirm the district court's decision that the fourteenth amendment has not been violated.